## STATE OF CONNECTICUT *v.* LAQUAN LEDBETTER
### (SC 17307)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued April 12—officially released September 27, 2005

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Thomas R. Garcia*, assistant state's attorney, for the appellee (state).

*Michael A. Fitzpatrick, Tanina Rostain* and *Barry Scheck*, pro hac vice, filed a brief for the Innocence Project, Inc., et al. as amici curiae.

*Opinion*

BORDEN, J. The defendant, Laquan Ledbetter, appeals from the trial court's judgment of conviction, rendered after a jury trial, of two counts of robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (3)[1] and 53a-8 (a),[2] and two counts of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a)[3] and 53a-134 (a) (3). The defendant raises the following two claims of error, each pertaining to separate counts of robbery and conspiracy

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

to commit robbery: (1) the evidence was insufficient to prove the counts of robbery and conspiracy to commit robbery associated with Docket No. HHDCR01181112T beyond a reasonable doubt; and (2) the trial court improperly admitted the victim's identification of the defendant into evidence on the counts of robbery and conspiracy to commit robbery associated with Docket No. HHDCR01181111T. We affirm the judgment of the trial court.

The defendant was charged with four counts each of robbery in the first degree in violation of §§ 53a-134 (a) (3) and 53a-8 (a), and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (3). The jury found the defendant guilty of two counts each of robbery in the first degree and conspiracy to commit robbery in the first degree.[4] The trial court rendered judgment of conviction in accordance with the verdict. This appeal followed.[5]

The jury reasonably could have found the following facts. Around 11 p.m. on November 30, 2001, Stephanie Mace was walking on Whiting Road in East Hartford when a black car, traveling in the same direction as she, stopped at the curb a few feet in front of her. Four males, wearing hooded sweatshirts, exited the vehicle; a fifth male remained in the driver's seat of the vehicle. After Mace had walked past the four males, she was

---

[4] The four separate cases, each pertaining to a separate victim, were consolidated for trial. The jury found the defendant guilty on Docket Nos. HHDCR01181111T and HHDCR01181112T.

The defendant was also charged in a fifth case, Docket No. H14HCR00102038T, with violation of probation in violation of General Statutes § 53a-32. That case was tried to the court following the defendant's conviction on the robbery charges, and the court rendered judgment of guilty of violation of probation.

[5] The defendant appealed from the judgment of the trial court to the Appellate Court. Upon the defendant's motion, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

graspeд by her shirt and pulled backwards. She was then turned around, and one of the males punched her in the eyebrow, causing her to fall to the ground. The four males surrounded Mace. When she started screaming, one of the males produced a knife and, holding it close to her face, told her that, if she continued to scream, they would cut her throat.

The assailants demanded money. Mace initially denied having any money, but then recalled that she had $1.50 in a white plastic bag she was carrying that also contained some baby clothes and other items. When she told the assailants that they could take the money from the bag, they took the bag and its contents. They also searched Mace's pockets, tearing the pants she was wearing in the process. The four males then ran back to and entered the vehicle. After the vehicle made a U-turn, one of the occupants warned Mace not to get up or to call the police.

Mace waited for the vehicle to reach the corner of Whiting Road and Mercer Avenue before she got up and ran to her mother's home, which was less than a minute away. While Mace was attempting to explain what had happened, her mother called the police and for an ambulance.

Also around 11 p.m. that night, Brian Leonard, while walking down Sisson Street to a convenience store at the corner of Sisson Street and Main Street in East Hartford, observed a black, four door sedan pull into a driveway approximately thirty to forty feet in front of him. Two black males exited the vehicle and approached Leonard quickly, side by side, one slightly in front of the other. As they approached, Leonard noticed that the one in front held a knife in his hand. That assailant struck Leonard, while, at the same time, Leonard, in an attempt to defend himself, seized the assailant's hand that held the knife. As Leonard attempted to

disarm the first assailant, the second assailant knocked Leonard's feet out from under him, causing him to fall to the ground along with the first assailant. During the ensuing struggle, the assailants threatened to cut or stab Leonard.

As Leonard was struggling with the assailants, the black sedan approached them. When the vehicle stopped, a male exited the driver's side of the vehicle, advanced toward Leonard and began kicking him. Leonard indicated that he had money that he would give to the assailants, if they would allow him to get up off the ground. When the assailants allowed Leonard to stand up, he pulled $5 from his pocket and threw it to the ground. At approximately the same time, a noise or a light startled the assailants, causing them to return to their vehicle and flee. As the vehicle traveled in reverse down Sisson Street toward Main Street, Leonard noticed that it contained five black males.

Leonard then proceeded to the convenience store, where he telephoned the police. During the telephone call, he explained what had happened and described the vehicle, its occupants and its direction of travel. Shortly thereafter, Officer Daryl Droun of the East Hartford police department arrived at the convenience store. Leonard walked out of the convenience store and joined Droun in his cruiser. Leonard sat in the backseat; Droun sat in the driver's seat. After refusing Droun's offer to get him medical care for some bruising and bleeding on his face, Leonard described his assailants and their vehicle; Droun broadcast the descriptions over his radio. As Leonard and Droun continued to talk, they heard over Droun's radio that five individuals in a vehicle matching the description given by Leonard had been stopped by police at the corner of Main Street and Pitkin Street in East Hartford. After hearing this information over the radio, Leonard requested the opportunity to attempt to identify his assailants.

Droun drove Leonard to the location where the vehicle had been stopped. When Droun and Leonard arrived, the five black males that had occupied the vehicle were lined up in front of a police cruiser with police officers on either side of them and the light from the headlights of several police cruisers shining on them. Some of the police cruisers also had their overhead emergency lights on. Droun stopped his cruiser approximately fifty to 100 feet from the suspects, with the light from its headlights shining on them. Droun instructed Leonard to remain in the cruiser. After verifying that Leonard could see the suspects clearly, Droun exited the cruiser and walked to the rear door on the driver's side. When Droun leaned into the open window of the cruiser, Leonard immediately identified two of the suspects, one of which was the defendant, as his initial assailants. He also made a tentative identification of the third assailant but could not be "100 percent positive . . . ." All five suspects were subsequently arrested. Droun also returned to Leonard a $5 bill recovered at the scene of the identification.

A search of the suspects' vehicle, conducted at the scene, revealed a knife under the floor mat of the front passenger seat. A subsequent inventory search of the vehicle, conducted after it had been towed to the police department evidence lockup, revealed two skull caps,[6] one black and one gray, and a black scarf. Additional facts will be set forth as necessary.

The state filed charges against the defendant in four separate long form informations pertaining to each of four separate victims who were robbed on November 30, 2001.[7] Each information contained one count of robbery in the first degree and one count of conspiracy

---

[6] Officer Nathan Stebbins of the East Hartford police department described a skull cap as "like a kind of a hat and a handkerchief kind of thing."

[7] In addition to the incidents involving Mace and Leonard, two other similar robberies occurred on that evening.

to commit robbery in the first degree. The four informations were consolidated for trial, but each victim's testimony was not cross admissible. The defendant subsequently was tried before a jury and found guilty of the charges contained in the two informations pertaining to Mace and Leonard. The trial court rendered judgment on the verdicts and sentenced the defendant to imprisonment for twenty years, execution suspended after twelve years, and five years probation.

I

## INSUFFICIENCY OF THE EVIDENCE

With respect to the convictions pertaining to the robbery of Mace, the defendant claims on appeal that the state failed to present sufficient evidence for the jury to conclude beyond a reasonable doubt that the defendant had conspired to commit robbery in the first degree and had committed robbery in the first degree. Specifically, the defendant contends that, in light of the deficiencies in the case against him, Mace's identification at trial of the knife recovered from the seized vehicle as the weapon used to threaten her was insufficient to sustain a conviction. The defendant identifies the following deficiencies: (1) Mace was unable to identify her assailants; (2) Mace testified that her assailants were wearing ski masks, but the police recovered no ski masks from the vehicle; (3) the police recovered none of Mace's stolen possessions from either the vehicle or its occupants; (4) Mace did not identify the vehicle, either directly or by photograph; (5) although Mace testified that the vehicle used by her assailants had a metallic stripe, the state did not introduce evidence that the seized vehicle had such a stripe; (6) Mace did not testify that the vehicle used by her assailants was missing its rear bumper, a distinguishing feature of the seized vehicle; (7) the state did not produce any physical evidence connecting the defendant to the robbery of

Mace; (8) none of the other occupants of the seized vehicle testified that the defendant participated in robbing Mace; (9) Mace was unable to describe any unique feature of the knife before it was shown to her in court; (10) Mace was not asked to select the knife from a group of knives; (11) the knife was found under a front floor mat of the seized vehicle, whereas the defendant was seated in the rear of the vehicle; and (12) the state's timetable was vague, allowing for the possibility that the defendant joined the other occupants of the vehicle sometime between the time Mace was robbed and the time the vehicle was stopped. We are unpersuaded.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of

evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 405–406, 869 A.2d 1236 (2005).

Because of the cumulative impact of the direct and circumstantial evidence presented by the state, we conclude that a reasonable view of the evidence exists that supports the jury's verdict of guilty on the conspiracy and robbery charges pertaining to Mace. In assessing the defendant's claim, we focus on the evidence before the jury at trial, not on the state's failure to present the types of evidence that might be presented in other prosecutions for robbery. The defendant was free to explore any deficiencies in the state's case during cross-examination of Mace or the state's other witnesses. Moreover, we recognize that, pursuant to § 53a-8 (a), the jury did not have to find that the defendant actually wielded the knife during the robbery of Mace; it had to

find that the defendant was a participant in the robbery, specifically, one of the four assailants that accosted Mace or the driver of the vehicle used to flee the scene. See footnote 2 of this opinion.

From the testimony of Mace and Officer Robert Backus of the East Hartford police department, along with the reasonable and logical inferences to be drawn from that testimony, the jury reasonably could have concluded beyond a reasonable doubt that the defendant was such a participant. Mace testified to the following facts. As she was walking on Whiting Road in East Hartford around 11 p.m., a black car stopped a few feet in front of her. Four males exited the vehicle, while a fifth male remained in the driver's seat. One or more of the males assaulted her and demanded money. After all four males surrounded her, one of them produced a knife, with which he threatened to cut her throat. While this threat was being made, the knife was held close to her face. The males took from her a white plastic bag containing $1.50 along with some baby clothes and other items. At trial, Mace identified the knife that the assailant had held close to her face during the robbery.

The knife identified by Mace was the same knife recovered by Backus from beneath the passenger's seat floor mat of a black car that he stopped at the corner of Pitkin Street and Main Street in East Hartford between 11 p.m. and midnight the same night Mace was robbed. Backus further testified to the following facts. When the vehicle was stopped, it contained five black males, one of whom was the defendant, who was seated in the right rear passenger seat. The distance, as subsequently measured by Backus, from the location where Mace was robbed to the location where Backus stopped the vehicle was less than 3.2 miles. Thus, the testimony, if believed by the jury, established the following: (1) Mace was robbed by five males; (2) one of those males

threatened Mace with the use of a deadly instrument during the robbery; (3) the defendant was an occupant of the same color car that was used in the Mace robbery; (4) that car contained five males, the same number involved in the Mace robbery; (5) that car also contained the weapon used to threaten Mace during the robbery; and (6) that car and its occupants were in the general vicinity where the robbery took place during the general time frame when the robbery took place. We cannot conclude that no reasonable view of the evidence exists that supports the jury's verdict of guilty.

## II

## IDENTIFICATION OF THE DEFENDANT BY LEONARD

Prior to trial, the trial court conducted a hearing on the defendant's motion to suppress Leonard's identification of the defendant that occurred during the vehicle stop at the corner of Pitkin Street and Main Street. The defendant argued that the identification was unnecessarily suggestive because Leonard knew that he was going to a location where five black males had been stopped in a black car and because of the circumstances when Leonard made the identification, namely, that the area was well lit, several police cruisers were present with their headlights on, some of the cruisers had their emergency flashers on, several uniformed police officers were present, the five suspects were the only individuals present who were not uniformed police officers, and the suspects were all handcuffed. Moreover, the defendant argued that the identification was unreliable under the totality of the circumstances. The trial court denied the defendant's motion to suppress the identification because it found that the identification procedure was not unnecessarily suggestive, and the identification was reliable under the totality of the circumstances.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress the identification made by Leonard. The defendant argues that the trial court's decision violated his state and federal constitutional rights to due process and a fair trial because the identification was both unnecessarily suggestive and unreliable. The defendant further asserts that, if we conclude that the identification did not violate his constitutional rights because it is deemed reliable under the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972),[8] we should adopt new factors for determining reliability, under which the defendant contends that the identification would be deemed unreliable, under one of two theories: (1) the *Biggers* factors fail to protect the defendant's federal constitutional rights to due process in light of scientific information that was not available to the Supreme Court when it decided *Biggers*; or (2) the *Biggers* factors fail to protect the defendant's rights to due process under the constitution of Connecticut, article first, § 8,[9] which affords greater protection to Connecticut citizens than the federal constitution. In addition, the amici curiae[10] urge this court: (1) to con-

---

[8] We refer to the current factors for consideration in determining whether an identification is reliable under the totality of the circumstances as the *Biggers* factors because they were first summarized by the United States Supreme Court in *Neil* v. *Biggers*, supra, 409 U.S. 199–200. "[T]he factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Id.

[9] The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[10] The amici curiae are as follows: Innocence Project, at the Benjamin N. Cardozo School of Law; Center on Wrongful Convictions at Northwestern University School of Law in Chicago; Wisconsin Innocence Project at the University of Wisconsin Law School at Madison; North Carolina Center on Actual Innocence; Northern California Innocence Project at Santa Clara University Law School; and Connecticut Criminal Defense Lawyers Association.

clude that the failure to caution a witness that the perpetrator might not be present at an identification procedure renders that procedure unnecessarily suggestive per se, thus overruling our decision in *State* v. *Reid*, 254 Conn. 540, 556, 757 A.2d 482 (2000); and (2) to require a jury instruction, if the trial court deems such an identification reliable despite finding it unnecessarily suggestive, to caution the jury that the identification procedure was unnecessarily suggestive. We disagree that the trial court improperly denied the defendant's motion to suppress the identification made by Leonard under the current identification process standard, and we decline to adopt a revised standard under either the federal or the state constitution. We also decline to overrule our decision in *Reid*. The research on the perils of eyewitness identification cited by the defendant and the amici curiae, however, leads us to invoke our supervisory authority to require, in future cases, an appropriate jury instruction in certain cases involving eyewitness identification.

A

Admissibility of the Identification under the Current Identification Process Standard

We first address the defendant's argument that the trial court's denial of his motion to suppress the identification made by Leonard violated his constitutional rights under the current standard. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is

found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances.[11] . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect." (Internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 832, 817 A.2d 670 (2003).

Furthermore, "[w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 552–53, 747 A.2d 487 (2000).

In accordance with these principles, we begin with the first prong of the required inquiry, whether the pretrial identification procedure in the present case was unnecessarily suggestive. Because, "[g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect"; (internal quotation marks omitted) id., 553; "[a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Cook*, supra, 262 Conn. 832.

---

[11] We refer to this two-pronged inquiry as the *Manson* standard because it was first articulated by the United States Supreme Court in *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

The trial court described the identification procedure at issue in the present case as "a street show-up[12] of five individuals, basically or similar to a one-to-one."[13] "We have recognized that generally a one-to-one confrontation between a [witness] and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 247, 710 A.2d 732 (1998). We also have recognized, however, that the existence of exigencies may preclude such a procedure from being *unnecessarily* suggestive. See id., 248; *State* v. *Wooten*, 227 Conn. 677, 686–87, 631 A.2d 271 (1993); *State* v. *Amarillo*, 198 Conn. 285, 292–93, 503 A.2d 146 (1986).

"In the past, when we have been faced with the question of whether an exigency existed, we have considered such factors as whether the defendant was in custody, the availability of the victim, the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail." *State* v. *Holliman*, 214 Conn. 38, 48, 570 A.2d 680 (1990). We have also considered whether the identification procedure provided the victim with an opportunity to identify his assailant while his memory of the incident was still fresh. *State* v. *Wooten*, supra, 227 Conn. 686.

Although the police had no reason to suspect that Leonard's availability might become an issue, the

[12] A " 'show-up' " is "the presentation of a single suspect to an eyewitness for possible identification." *State* v. *Findlay*, 198 Conn. 328, 337, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986).

[13] Consistent with its assessment that the procedure used by the police was similar to a one-to-one, the trial court rejected the suggestion that, because the defendant was only one of five individuals shown to Leonard at the vehicle stop, and Leonard positively identified only two of the individuals as his assailants, the procedure was similar to a lineup. In doing so, the court noted that all five individuals were clearly suspects, a fact of which Leonard was unquestionably aware.

remaining factors for determining whether an exigency existed weigh in favor of the state in the present case. The trial court found that, even though the police had adequate suspicion to detain the suspects, including the defendant, at the vehicle stop, the suspects were not under arrest, and, prior to the identification by Leonard, it was questionable whether the police had probable cause to arrest the suspects. Without probable cause to arrest the suspects, the police had no practical method to arrange for a series of lineups involving each individual suspect lined up with several similar looking males. Even with probable cause to arrest the suspects, it would have been impractical to arrange for such a series of lineups in a reasonable time frame after 11 p.m. Furthermore, in the present case, the police had a real need to determine whether they had apprehended the correct individuals in a timely manner. At the time of the identification, the police already had received three separate telephone calls, during a short time period of time, reporting robberies involving four or five black males in the general vicinity of the vehicle stop. If Leonard had not identified any of the vehicle's occupants as his assailants, the police could have continued their search for the perpetrators while some possibility existed that they remained active in the area. Finally, the trial court found that the identification procedure at issue provided Leonard an opportunity to view the suspects within approximately twenty minutes of having been attacked. In fact, Leonard requested the opportunity to view the suspects while his recollection of his assailants was fresh in his mind.

In *State* v. *Wooten*, supra, 227 Conn. 686–87, we concluded that these last two factors, enabling the police to focus their investigation and providing the victim an opportunity to identify her assailant while her memory was still fresh, were sufficient to prevent the identification procedure from being unnecessarily suggestive. In

*Wooten,* a police officer, while transporting a sexual assault victim to the hospital, informed her that the police had a suspect who they wished to have her attempt to identify. Id., 684. Consequently, approximately one-half hour after she was attacked, the victim identified the defendant as he sat in the back of a police car. Id., 684–85. We concluded that even though the identification procedure was "obviously suggestive"; id., 686; it was not unnecessarily suggestive "because it was prudent for the police to provide the victim with the opportunity to identify her assailant while her memory of the incident was still fresh . . . and because it was necessary to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay, if the victim excluded the defendant as a suspect or was unable to identify him." (Citation omitted; internal quotation marks omitted.) Id. The same reasoning applies in the present case.

Moreover, although Leonard knew that he was viewing suspects, the trial court found nothing unnecessarily suggestive about the identification procedure itself. Leonard was presented with five individuals, two of whom he positively identified. None of the individuals was asked to step forward during the procedure. The trial court found that Officer Droun limited his remarks to, " 'Take your time. Take a look. And be sure,' or words to that effect." In light of the trial court's findings, which are supported by the record, that court did not abuse its discretion in determining that the identification procedure was not unnecessarily suggestive.

The defendant argues that, because he had been arrested previously, a fact that the police could have discovered through additional investigation, the police could have prepared a photographic array that included the photograph from his prior arrest to show to Leonard in the hospital. This argument ignores the importance of an opportunity to obtain a prompt identification and

the fact that the defendant was only one of five suspects viewed by Leonard, not the focus of the identification procedure as in a typical one-to-one confrontation. The defendant also argues that the prompt identification was not necessary to arrest the suspects because, when Leonard arrived, a suspect was in the process of giving an inculpatory statement to a police officer while, at the same time, other officers were searching the vehicle, where they subsequently would discover the knife and other inculpatory evidence. In addition to failing to address the importance of giving the victim an opportunity to identify his assailants while the incident was fresh in his mind, this argument presumes that the focus of the police investigation was to acquire sufficient evidence to make an arrest. The focus of the police investigation was to apprehend the perpetrators of the robberies. Leonard's identification provided additional assurance that the police had done so. Furthermore, the police were required neither to conduct their investigation in a linear fashion, putting it on hold as soon as they had sufficient evidence to arrest the suspects at the vehicle stop, nor to foresee that they would soon acquire sufficient evidence to make an arrest without Leonard's identification.

Finally, the defendant argues that a countervailing exigency existed, namely, that the police had an interest "in protecting Leonard's memory from being inevitably and irrevocably tainted by the suggestive show-up." Essentially, the defendant contends that, if it were later discovered that Leonard's identification had been wrong, his memory might have been so tainted by this procedure that he would have been unable to identify the true assailants, and, even if he did correctly identify them, his credibility would have been damaged. At the same time, the police would have lost the opportunity to pursue the true perpetrators. We fail to see how these concerns, which could be said to exist in any

suggestive identification procedure, outweigh the advantages of a prompt identification discussed previously in this opinion. Although this identification procedure may have been suggestive, it was not unnecessarily so.

Furthermore, even if we were to assume that the procedure was unnecessarily suggestive, the trial court did not abuse its discretion in finding that the identification was, nevertheless, reliable based on an examination of the totality of the circumstances. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Citation omitted; internal quotation marks omitted.) *State* v. *Cook*, supra, 262 Conn. 836–37; see *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

With respect to Leonard's opportunity to view his assailants at the time of the crime, the trial court made the following findings. Even though the attack occurred at night, the area where it occurred was well lit by house and street lights. Leonard had an opportunity to observe his assailants' faces, both as they approached him and as he struggled with them on the ground, from a very close range. Furthermore, although the struggle occurred over a matter of seconds, Leonard looked at and focused on their faces. "We have said of identification that a good hard look will pass muster even if it occurs during a fleeting glance." (Internal quotation marks omitted.) *State* v. *Cubano*, 203 Conn. 81, 95, 523

A.2d 495 (1987). Here, the trial court specifically found that Leonard got "a good, hard look . . . at each of his two assailants . . . ."

With respect to Leonard's degree of attention, the trial court made the following findings. Leonard focused on the two assailants as they ran at him. Although he noticed that one of the males had a knife and experienced concern about being stabbed or cut, Leonard continued to focus on the faces of both males, both before and after he fell to the ground. Thus, Leonard's degree of attention to his assailants remained high throughout the encounter.

With respect to the accuracy of Leonard's description of his assailants, the trial court made the following findings. Although the description was general, Leonard provided gender, race, approximate height, approximate weight, body type and that one of the assailants wore a hat. He also provided a description of the vehicle and the weapon used by the assailants.

With respect to the level of certainty Leonard demonstrated at the identification, the trial court made the following findings. Leonard's level of certainty "was very high, exceedingly high." He indicated to Droun that he was sure that he could identify the first two assailants if he saw them again. He identified the defendant and another individual at the vehicle stop without hesitation. He also indicated, at the identification procedure, that he was positive that the men whom he had identified were the first two individuals to attack him during the robbery. Furthermore, no evidence exists that Leonard displayed any degree of uncertainty when he identified the two individuals.

Finally, with respect to the time between the robbery and the identification procedure, the trial court found that "an exceedingly short period of time," approximately twenty minutes, had elapsed between the rob-

bery and Leonard's identification of the defendant. On the basis of these findings, the trial court determined that the identification was reliable under the totality of the circumstances. The trial court's findings are supported by the record, and it did not abuse its discretion in determining that the identification was reliable under the totality of the circumstances, even when those circumstances are weighed against the suggestive procedure in the present case.

The defendant argues that several factors weigh against the reliability of the identification. The defendant points out that Leonard had been awake for approximately eighteen hours at the time of the incident and had imbibed three to four and one-half ounces of alcohol earlier in the evening. He also notes that the duration of the incident was short, while Leonard's focus was divided between viewing his assailants and defending himself from their attack. Finally, the defendant asserts that Leonard's identification of his assailants was very general, consisting only of build and race, whereas other identifications upheld by this court and the Appellate Court[14] were more specific.

[14] The defendant cites to the following as examples of cases where the witness, on the basis of a limited time frame to view the defendant during the incident, provided a more detailed description of the defendant than that provided in the present case: *State* v. *Cubano*, supra, 203 Conn. 95 (clothing, age, height, weight, complexion, facial shape and need of shave); *State* v. *Hinton*, 196 Conn. 289, 296, 493 A.2d 837 (1985) (race, age, height, complexion, hair length and clothing); *State* v. *McKnight*, 191 Conn. 564, 566, 469 A.2d 397 (1983) (height, race, clothing and "very neat looking"); *State* v. *Ledbetter*, 185 Conn. 607, 615–16, 441 A.2d 595 (1981) (approximate age, height, weight, hair style, complexion and color of pants and jacket); *State* v. *Thompson*, 81 Conn. App. 264, 271, 839 A.2d 622 (race, build and " 'dark colored clothing' "), cert. denied, 268 Conn. 915, 847 A.2d 312 (2004); *State* v. *Mills*, 57 Conn. App. 356, 358, 748 A.2d 891 (2000) (complexion, height, hair length, facial hair and clothing); *State* v. *Evans*, 44 Conn. App. 307, 320, 689 A.2d 494 (race, age, height, build, hair length, complexion, facial features and chipped front teeth), cert. denied, 240 Conn. 924, 692 A.2d 819 (1997); *State* v. *Lago*, 28 Conn. App. 9, 21, 611 A.2d 866 (height, build, hair, clothing and age), cert. denied, 223 Conn. 919, 614 A.2d 878 (1992); *State* v. *Vega*, 13 Conn. App. 438, 443–44, 537 A.2d 505 (1988) (approxi-

Although some factors may have weighed against the reliability of the identification, the trial court gave adequate consideration to those factors in making its determination, and the defendant fails to satisfy his burden of establishing that the trial court abused its discretion in reaching that determination. The trial court noted that Leonard awoke about 5 or 6 a.m. and had three vodka cocktails around dinner, finishing the last drink at approximately 8 p.m. Nevertheless, it found that the evidence did not indicate that he was inebriated or that his ability to observe was impaired in any way. As noted previously in this opinion, the trial court recognized that the duration of the incident was short and that Leonard's description was general but found that Leonard had focused on his assailants and also described the weapon and the vehicle used during the incident. Finally, in assessing the reliability of the identification, the trial court properly considered the totality of the circumstances; it was not required to determine that the identification was not reliable because Leonard's initial description of his assailants did not include as much detail as has been included in other cases. Lack of a more specific identification was considered by the trial court, however, when it considered the totality of the circumstances. It determined that the identification was reliable, and that determination was not an abuse of discretion.

## B

### Constitutional Challenges to the Current Identification Process Standard

The defendant contends that the strongest *Biggers* factor supporting the reliability of the identification in

mate age, height, weight, build, hair style, facial hair, complexion, clothing, knife, stolen radio and furtive movement of eyes); and *State* v. *Vilhotti*, 11 Conn. App. 709, 711, 529 A.2d 235 (1987) (age, race, hair color, build and "pock-marked face").

the present case, under the *Manson* standard, is the level of certainty that Leonard demonstrated when he identified the defendant. The defendant argues, however, that scientific studies "universally show" that this factor, in particular, has no relationship to whether the identification is correct. Consequently, the defendant urges this court to abandon the *Biggers* factors on either federal or state constitutional grounds. The defendant recommends that we adopt, instead, the factors adopted by the Utah Supreme Court, under the due process clause of the Utah constitution, set forth in *State* v. *Ramirez*, 817 P.2d 774, 781 (Utah 1991): "(1) [t]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's." (Internal quotation marks omitted.) Using these factors on remand, the defendant contends, the trial court should determine that Leonard's identification lacked sufficient reliability to offset the corruptive effect of the suggestive identification procedure. The state counters that, because the defendant, at trial, specifically argued that the *Manson* standard governed the admissibility of the identification, he either waived his constitutional claims or failed to preserve them for review. Although we disagree that the defendant's claims are not reviewable, we decline to abandon the *Biggers* factors on either federal or state constitutional grounds.

The defendant's motion to suppress identification testimony preserved his claims that admission of the identification violated his rights under both the federal and state constitutions without the need to request review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant moved the trial court to suppress the identification pursuant to article first, § 8, of the constitution of Connecticut and the fifth[15] and fourteenth amendments[16] to the United States constitution. Furthermore, the defendant did not waive his claims. During the hearing on the merits of his motion, the defendant argued correctly, at least with respect to his claims under the federal constitution, that the admissibility of the identification was governed by *Manson* v. *Brathwaite*, supra, 432 U.S. 98.[17] Because, in light of decisions by the United States Supreme Court and this court concerning the admissibility of identification evidence, the trial court lacked the authority to abandon the *Biggers* factors on either federal or state constitutional grounds, the admissibility of the identification *was* governed by the standard set forth in *Manson*. The defendant's failure to request that which the trial court

---

[15] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

[16] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[17] Although we have never, before the present case, specifically stated that the standard for admissibility of identification evidence under article first, § 8, of the constitution of Connecticut duplicates the standard under the fourteenth amendment to the United States constitution, we have consistently applied the standard articulated in *Manson* whenever a defendant has claimed that admission of identification evidence resulted in a deprivation of his rights under both the federal and the state constitutions without distinguishing between the two. See, e.g., *State* v. *Reid*, supra, 254 Conn. 553–55; *State* v. *Gordon*, 185 Conn. 402, 412–15, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). Thus, the defendant's reference to *Manson* was also consistent with arguing that his rights were violated under the constitution of Connecticut.

lacked authority to grant, namely, modification of a standard promulgated by the United States Supreme Court pursuant to the constitution of the United States; see *Oregon* v. *Hass*, 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975); and adopted by this court, does not constitute a waiver of the defendant's argument. In other words, the defendant was not required to make futile arguments before the trial court in order to prevent waiver of those arguments before this court.

1

Modification of the Identification Process Standard Pursuant to the Constitution of the United States

The defendant first argues that we should modify the *Manson* standard, on federal constitutional grounds, to incorporate factors "demonstrably related to accurate identifications . . . ." He asserts that we can do so on the basis of new scientific information not available to the United States Supreme Court when it enumerated the current factors in *Neil* v. *Biggers*, supra, 409 U.S. 199–200, or when it reiterated those factors in *Manson* v. *Brathwaite*, supra, 432 U.S. 114. We disagree.

We lack the authority to replace the *Biggers* factors on federal constitutional grounds for the same reason that the trial court lacked the authority to do so. A state may not impose greater restrictions on police activity, as a matter of federal constitutional law, than those held necessary upon federal constitutional standards by the United States Supreme Court. *Oregon* v. *Hass*, supra, 420 U.S. 719. That court concluded that the factors used in *Manson* satisfy the due process clause of the fourteenth amendment to the United States constitution. *Manson* v. *Brathwaite*, supra, 432 U.S. 113–14. That the modified factors proposed by the defendant constitute a greater restriction on police activity than those adopted by the United States Supreme Court cannot be disputed given the defendant's argument that the

current factors should be abandoned and new factors adopted under the state constitution because it provides greater due process protection to Connecticut citizens than the federal constitution. Accordingly, we lack the authority to hold now that, in light of additional scientific information, those factors no longer satisfy federal constitutional strictures.

2

Modification of the Identification Process Standard Pursuant to the Constitution of Connecticut

We next consider the defendant's argument that we should replace the *Biggers* factors on state constitutional grounds. As noted in part II B 1 of this opinion, the defendant asserts that such an approach would be warranted because the constitution of Connecticut provides greater protection in this area than the constitution of the United States. We disagree.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 206, 833 A.2d 363 (2003). Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. Id. "The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [222 Conn.

672, 684–86, 610 A.2d 1225 (1992)], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 207–208.

The first factor, federal precedent, favors the state. It is well settled, as conceded by the defendant, that the federal courts apply the *Biggers* factors in determining the reliability of an identification. See, e.g., *United States* v. *Hines*, 387 F.3d 690, 694 (8th Cir. 2004); *United States* v. *Beverly*, 369 F.3d 516, 539 (6th Cir.), cert. denied, 543 U.S. 910, 125 S. Ct. 122, 160 L. Ed. 2d 188 (2004); *United States* v. *Washington*, 353 F.3d 42, 45 (D.C. Cir. 2004); *McFowler* v. *Jaimet*, 349 F.3d 436, 449 (7th Cir. 2003); *United States* v. *Henderson*, 320 F.3d 92, 100 (1st Cir.), cert. denied, 539 U.S. 936, 123 S. Ct. 2597, 156 L. Ed. 2d 620 (2003); *Gray* v. *Klauser*, 282 F.3d 633, 640 (9th Cir.), vacated, 537 U.S. 1041, 123 S. Ct. 658, 154 L. Ed. 2d 512 (2002); *Raheem* v. *Kelly*, 257 F.3d 122, 135 (2d Cir.), cert. denied, 534 U.S. 1118, 122 S. Ct. 930, 151 L. Ed. 2d 892 (2001); *United States* v. *Burbridge*, 252 F.3d 775, 780 (5th Cir. 2001); *United States* v. *Bredy*, 209 F.3d 1193, 1195–96 (10th Cir. 2000); *United States* v. *Murray*, 65 F.3d 1161, 1169 n.6 (4th Cir.), cert. denied, 531 U.S. 897, 121 S. Ct. 229, 148 L. Ed. 2d 164 (1995); *Government of the Virgin Islands* v. *Riley*, 973 F.2d 224, 228 (3d Cir. 1992); *Johnson* v. *Dugger*, 911 F.2d 440, 450 (11th Cir.), vacated, 920 F.2d 721 (1990), on remand, 938 F.2d 1166 (11th Cir.), cert. denied, 506 U.S. 930, 113 S. Ct. 361, 121 L. Ed. 2d 274 (1991).

The defendant argues that this factor should be considered neutral because "[i]t is unclear to what extent the federal appellate courts have been presented with the psychological research critical of the standards." This argument is untenable in light of the defendant's contention that "[r]esearchers have been critical of the [*Biggers*] test for decades." On the one hand, the defendant asserts that criticism of the *Biggers* factors has been so consistent and ubiquitous that we should abandon those factors on federal constitutional grounds; see part II B 1 of this opinion; on the basis of a review of the scientific research. On the other hand, he suggests that the federal appellate courts may be unaware of that research. The dichotomy of the scientific research being so ubiquitous, while the federal appellate courts remain unaware of it, seems highly implausible. Moreover, our analysis of this factor consists of reviewing existing federal precedent, not engaging in speculation about what the federal courts might do if presented with different arguments.

The second factor, the textual approach, also favors the state. The due process clauses of the state and federal constitutions are virtually identical. See footnotes 9, 15 and 16 of this opinion. The defendant contends that this fact makes this factor neutral. We disagree. The similarity between the two provisions does not support that article first, § 8, of the Connecticut constitution offers greater protection in the area of defendant identification procedures than the federal constitution; cf. *Washington* v. *Meachum*, 238 Conn. 692, 719, 680 A.2d 262 (1996) (text of article first, § 7, of state constitution does not support it providing greater protection than fourth amendment to federal constitution when two provisions virtually identical); whereas, it does support a common source[18] and, thus, a common interpretation of the provisions.

---

[18] "The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the

The third factor, the historical approach, is neutral. Neither the defendant nor the state identifies any relevant evidence of the intent of the framers of our constitution that helps clarify whether they intended to provide broader protection than the federal constitution in this area. See *State* v. *Rizzo*, supra, 266 Conn. 212–13.

The fourth factor, the holdings and dicta of Connecticut appellate courts, favors the state. As stated previously in this opinion, this court consistently has applied the *Biggers* factors when the reliability of an identification has been challenged on both state and federal constitutional grounds. See footnote 17 of this opinion. The defendant argues that this factor is neutral because his introduction of scientific research makes this issue one of first impression in Connecticut. We are not persuaded. Although we agree that the scientific research introduced by the defendant may impact the sixth factor discussed later in this opinion, its introduction does not transform this issue into one of first impression.

The fifth factor, the sibling approach, is neutral. Although the vast majority of states apply the *Biggers* factors to the reliability of identification procedures; see *Commonwealth* v. *Johnson*, 420 Mass. 458, 472–73, 474 n.2, 650 N.E.2d 1257 (1995) (Nolan, J., dissenting) and cases cited therein; many of the cases applying those factors fail to indicate whether the due process analysis occurs under the federal or the state constitution. To the extent that the state courts perform the analysis under the federal constitution, they are precluded from imposing greater restrictions on police activity than those required under the federal constitutional standards set forth by the United States Supreme

federal bill of rights and the Virginia declaration of rights of 1776." (Internal quotation marks omitted.) *State* v. *Mikolinski*, 256 Conn. 543, 548, 775 A.2d 274 (2001).

Court. See part II B 1 of this opinion. Thus, although a majority of the courts of our sister states have applied the *Biggers* factors during their identification procedure analyses, most of the decisions that do so are irrelevant for the purpose of this prong in the *Geisler* analysis because they reveal nothing about what those courts have held is required under their own state constitutions.

The state identifies two states, Idaho and New Hampshire, that have adopted the *Biggers* factors after considering the issue under their own state constitutions. In *State* v. *Buti*, 131 Idaho 793, 798–99, 964 P.2d 660 (1998), the Supreme Court of Idaho applied the *Biggers* factors in determining that the challenged identification procedure did not violate the due process clause of article first, § 13, of the Idaho constitution[19] because the identification was reliable. In *State* v. *Leclair*, 118 N.H. 214, 218, 385 A.2d 831 (1978), the Supreme Court of New Hampshire noted that the *Manson* standard is based on the requirements of the federal constitution, and that the state could adopt a more strict standard under state law. It chose, nevertheless, to apply the *Manson* standard. Id., 219. After determining that the identification procedure was unnecessarily suggestive in *Leclair*, the court applied the *Biggers* factors in concluding that the reliability of the identification did not outweigh the corrupting effect of the suggestive identification. Id., 219–20.

The defendant, on the other hand, identifies four states, Massachusetts, New York, Utah and Wisconsin, that have rejected the *Manson* standard on state constitutional grounds. Two of those states, Massachusetts; see *Commonwealth* v. *Johnson*, supra, 420 Mass.

---

[19] Article first, § 13, of the Idaho constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law."

462–63; and New York; see *People* v. *Adams*, 53 N.Y.2d 241, 250–51, 423 N.E.2d 379, 440 N.Y.S.2d 902 (1981); interpret their state constitutions as requiring that identifications obtained through the use of unnecessarily suggestive identification procedures be excluded per se. Thus, those jurisdictions have not considered whether the *Biggers* factors violate their state constitutions because they did not reach the issue of reliability. Additionally, the Supreme Court of Wisconsin has recently determined that its state constitution requires the exclusion of an out-of-court show-up identification, unless, based on the totality of the circumstances, the procedure was necessary. *State* v. *Dubose*, 285 Wis. 2d 143, 699 N.W.2d 582, 593–94 (2005). Although the court expressly stated that its rule is not a "per se exclusionary rule," the effect of the rule is the same as that adopted in New York and Massachusetts, at least as applied to show-up identifications, to which the Wisconsin court limited its holding, namely, that such identifications, when unnecessarily suggestive, are inadmissible. Id., 598. No showing of reliability under a *Manson/Biggers* analysis will save such an unnecessarily suggestive identification. Id., 593–94. Instead, based on extensive studies and research in recent years that show that eyewitness testimony is "often 'hopelessly unreliable,' " the court returned to the pre-*Manson/Biggers* analysis. Id., 592, 593 n.9. Thus, like Massachusetts and New York, Wisconsin has not considered whether the *Biggers* factors violated its state constitution. By contrast, Utah directly addressed those factors in *State* v. *Ramirez*, supra, 817 P.2d 780, and concluded that article first, § 7, of the Utah constitution[20] requires a more empirically sound set of reliability factors; see part II B of this opinion; that are supported by scientific research. After reviewing the opinions of

---

[20] Article first, § 7, of the Utah constitution provides: "No person shall be deprived of life, liberty or property, without due process of law."

our sister courts that have considered this issue under their state constitutions, we conclude that the scales remain balanced on this *Geisler* factor.

The sixth factor, economic and sociological considerations, favors the defendant. The defendant cites to research studies critical of the *Biggers* factors.[21] The uncontradicted scientific literature cited by the defendant suggests that the fourth *Biggers* factor is particularly flawed because a weak correlation, at most, exists between the level of certainty demonstrated by the witness at the identification and the accuracy of that identification. See, e.g., A. Bradfield & G. Wells, "The Perceived Validity of Eyewitness Identification Testimony: A Test of the Five *Biggers* Criteria," 24 Law & Hum. Behav. 581, 592 (2000); G. Wells, M. Small & S. Penrod et al., "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," 22 Law & Hum. Behav. 603, 622 (1998); M. Leippe, "Effects of Integrative Memorial and Cognitive Processes on the Correspondence of Eyewitness Accuracy and Confidence," 4 Law & Hum. Behav. 261, 262 (1980). The research suggests that, at the same time, this factor seems to have a significant impact on the reliability analysis. S. Sporer, "Eyewitness Identification Accuracy, Confidence, and Decision Times in Simultaneous and Sequential Lineups," 78 J. Applied Psychol. 22, 23 (1993) ("both professionals and lay people [jurors] alike put particular faith in the confidence a witness displays when making a lineup decision"). The research studies also indicate that the witness' level of confidence in the identification is "malleable," or susceptible to cues

---

[21] See, e.g., A. Bradfield & G. Wells, "The Perceived Validity of Eyewitness Identification Testimony: A Test of the Five *Biggers* Criteria," 24 Law & Hum. Behav. 581, 582 (2000); G. Wells & A. Bradfield, " 'Good You Identified the Suspect': Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience," 83 J. Applied Psychol. 360, 361 (1998); G. Wells & D. Murray, "What Can Psychology Say About the *Neil v. Biggers* Criteria for Judging Eyewitness Accuracy?," 68 J. Applied Psychol. 347 (1983).

from the administrator of the identification procedure. See A. Bradfield, G. Wells & E. Olson, "The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy," 87 J. Applied Psychol. 112 (2002); G. Wells, M. Small & S. Penrod et al., supra, 22 Law & Hum. Behav. 624–26. Furthermore, these same cues also may affect other self-reported *Biggers* factors such as the opportunity to view the perpetrator and the witness' level of attention. See G. Wells & A. Bradfield, " 'Good You Identified the Suspect': Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience," 83 J. Applied Psychol. 360, 374 (1998).

The state argues that this court should not consider the research studies, which were not presented to the trial court, because they are not part of the record in this appeal. The state contends, therefore, that it was deprived of an opportunity to present evidence, and the trial court was deprived of the opportunity to make factual findings thereon. The defendant counters that "contemporary understandings of applicable economic and sociological norms"; (internal quotation marks omitted) *State* v. *Geisler*, supra, 222 Conn. 686; include economic, scientific and social research published in reputable journals. Consistent with our conclusion that the defendant's arguments under the federal and state constitutions are reviewable by this court; see part II B of this opinion; we conclude that review of the scientific research on the potential dangers of eyewitness identification by this court is appropriate. In other words, the defendant was not required to introduce scientific studies critical of the *Biggers* factors to the trial court, at the same time that he was arguing that the identification in the present case was unreliable under those factors, just to preserve the opportunity to present those studies to this court. To do so would have been

a waste of judicial resources, given that the trial court was bound to apply the *Biggers* factors in its analysis.

Moreover, contrary to the state's argument, it is appropriate for this court to survey relevant scientific data as that data has been reported in the decisions of other courts and in the scientific literature. Such a survey does not amount to fact-finding by this court. "[A]n appellate court may take judicial notice of the existence of a body of scientific literature. . . . To ensure consistency in the approach to scientific evidence, a court should examine the foundation evidence received, if any; the scientific literature; and other courts' analyses. . . . Indeed, even when, as in this case, there has been no evidence introduced at the trial level, an appellate court may properly analy[ze] . . . the issues . . . based [only] on consideration of the information gleaned from prior reported cases and published literature on the subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Porter*, 241 Conn. 57, 94–95, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Furthermore, to the extent that the state's argument suggests that it was deprived of an opportunity to present scientific research contradicting that presented by the defendant, we disagree. The state had an opportunity in its brief to this court to offer any relevant scientific research; it failed to do so. At oral argument before this court, the state was specifically asked if it was aware of any studies contrary to those offered by the defendant and was unable to identify any such studies.

Despite the fact that this last factor favors the defendant, we are unpersuaded that article first, § 8, of the constitution of Connecticut provides greater protection than the federal constitution in this area. The scientific studies are not definitive. For instance, some studies showed no correlation, or even a negative correlation between witness confidence and the accuracy of the

identification, while others showed a positive correlation. See G. Wells, M. Small & S. Penrod et al., supra, 22 Law & Hum. Behav. 622; M. Leippe, supra, 4 Law & Hum. Behav. 261. Moreover, the studies suggest that the correlation may be stronger for witnesses who identify a subject during the identification procedure than for those who determine that the perpetrator is not present. See G. Wells, M. Small & S. Penrod et al., supra, 623; S. Sporer, supra, 78 J. Applied Psychol. 22, 30. Research also suggests "that the certainty—accuracy relation is higher under good viewing conditions than under poor viewing conditions." A. Bradfield, G. Wells & E. Olson, supra, 87 J. Applied Psychol. 114. These results have led some researchers to "propose that the relation between eyewitness identification certainty and accuracy is not a single value but instead is a family of possible values." Id., 112. In light of the factors that weigh in favor of the state, the scientific studies are insufficient to tilt the balance of the *Geisler* analysis in favor of the defendant. Thus, our state constitution does not require that we abandon the *Biggers* factors as the appropriate factors for consideration in determining whether an unnecessarily suggestive identification procedure is, nevertheless, reliable, and we decline to do so.

## C

### Suggestive Per Se Identification Procedures and Jury Instruction

We next address the arguments of the amici curiae. They contend that a series of scientific studies[22] indicates that either telling a witness that a suspect will be present at an identification procedure or failing to warn

[22] As with the scientific studies proffered by the defendant, the state argues that this court should not review the scientific studies relied upon by the amici curiae because they were not the subject of a *Porter* hearing. *State v. Porter*, supra, 241 Conn. 69. For the reasons set forth in part II B 2 of this opinion, we disagree and conclude that this court's review of the studies is appropriate.

the witness that the perpetrator might not be present increases the likelihood that the witness will misidentify an innocent individual as the criminal, while warning the witness that the perpetrator might not be present at the procedure significantly decreases the likelihood of misidentifications without decreasing the percentage of correct identifications. Consequently, the amici curiae urge this court to adopt the following rule: Failure on the part of the police to give an affirmative warning that the perpetrator may not be present in a photographic array, lineup or show-up or comments by the police suggesting that a suspect is present during one of those procedures renders that procedure unnecessarily suggestive per se. If, after considering the appropriate reliability factors, the trial court determines that the resulting identification is, nevertheless, reliable, the jury should be instructed that the identification procedure was unnecessarily suggestive, which could increase the likelihood of mistaken identification. Adoption of this rule would require this court to overrule our decision in *State* v. *Reid,* supra, 254 Conn. 556, wherein we concluded that the fact that a police officer had informed the victim that a suspect was in the photographic array was insufficient to render the identification procedure unduly suggestive, and to revise part II A of this opinion.[23] Because we are not convinced that our reasoning in *Reid* is flawed, we decline to adopt a per se rule concerning whether an identification procedure is unnecessarily suggestive. In light of the scientific research on such procedures, however, we invoke our supervisory authority to require trial courts, in future trials, to incorporate a jury instruction informing the

[23] Adoption of the proposed rule would require this court to conclude that the identification procedure in the present case, which we concluded was *not* unnecessarily suggestive in part II A of this opinion, *was* unnecessarily suggestive because no evidence exists in the record to indicate that Droun informed Leonard that the perpetrators might not be present at the identification procedure.

jury of the risks inherent in certain eyewitness identifications.

1

### Suggestive Per Se Identification Procedures

In *Reid*, the victim provided a description of her attacker to the East Hartford police department on the day that she was sexually assaulted. Id., 544. Four days later, the victim identified the defendant as her attacker from a photographic array containing eight photographs. Id. Although the victim testified that she had not been told that the array contained a photograph of a suspect, the police officer who administered the identification procedure testified that he had informed the victim that the array contained a suspect's photograph. Id., 553. We concluded that "[s]uch a statement . . . is not enough to render an identification procedure unduly suggestive." Id., 556. In reaching that conclusion, we reasoned that "[w]hen presented with a photographic array by the police, crime victims reasonably can surmise that the police may consider one of the persons in the array to be a suspect in the case." Id., 557.

The amici curiae argue that this inference on the part of witnesses underscores the importance of an affirmative warning from the administrator of the identification procedure that the perpetrator may not be present in a photographic array, lineup or show-up. Without such a warning, they contend, the witness feels obligated to select one of the photographs or participants in the procedure, which may result in the witness choosing the individual who is the most similar to or least dissimilar from the actual perpetrator, regardless of whether the perpetrator is one of the choices in the identification procedure.

The scientific research supports this contention. "There is good empirical evidence to indicate that eye-

witnesses tend to identify the person from the lineup who, in the opinion of the eyewitness, looks most like the culprit relative to the other members of the lineup . . . ." G. Wells, M. Small & S. Penrod et al., supra, 22 Law & Hum. Behav. 613. The researchers refer to this phenomenon as the "relative judgment process." Id. "Relative judgments can be contrasted with absolute judgments in which the eyewitness compares each lineup member to his or her memory of the culprit and uses some type of criterion threshold to decide whether or not the person is the actual culprit . . . . There are numerous empirical observations that lead to the conclusion that the relative judgment process exerts a significant influence in eyewitness identifications. These include the behavior of witnesses under the removal-without-replacement procedure, the effects of warnings that the actual culprit might not be in the lineup, the effects of manipulations to relative similarity, patterns of eyewitness responses using the dual lineup procedure, and the performance of eyewitnesses using the sequential presentation procedure." Id., 614. "The problem with the relative judgment process . . . is that it includes no mechanism for deciding that the culprit is none of the people in the lineup." Id.

Research suggests that the administrator of an identification procedure may be able to reinforce the tendency to engage in the relative judgment process. In a research study on the certainty—accuracy relation, researchers isolated the accuracy variable by relying on the theory that "[w]hen combined with instructions that imply that the culprit is in the lineup, leaving the actual culprit out of the lineup almost always results in mistaken identification." A. Bradfield, G. Wells & E. Olson, supra, 87 J. Applied Psychol. 113–14. The researchers gave the participants a set of instructions implying that the perpetrator's photograph would be present in the photographic array that the participants

would be shown. One half of the 132 participants were then shown a photographic array that did contain the perpetrator's photograph, while the other one half of the participants were shown a photographic array that did not contain the perpetrator's photograph. Id. Of those participants who were shown the array with the perpetrator's photograph, 92 percent correctly identified the perpetrator. Id. Of those participants who were shown the array without the perpetrator's photograph, 100 percent chose one of the other individuals in the array. Id., 114.

Research also suggests that the administrator of an identification procedure may be able to negate, at least to some degree, the tendency to engage in the relative judgment process by warning that the perpetrator might or might not be present in the identification procedure. In one study, "[f]ailure to warn the eyewitness that the culprit might not be in the lineup resulted in 78 [percent] of the eyewitnesses attempting an identification from the culprit-absent lineup. This false identification rate dropped to 33 [percent] when the eyewitnesses were explicitly warned that the culprit might not be in the lineup. Importantly, warning the eyewitnesses that the culprit might not be in the lineup still resulted in 87 [percent] of the eyewitnesses making accurate identifications when the culprit was in the lineup, indicating that this instruction does not merely reduce eyewitnesses' willingness to identify someone. . . . [Moreover, a] recent meta-analysis of instruction effects shows that the 'might or might not be present' instruction has the effect of reducing identifications when the perpetrator is absent from the lineup while having no effect on identifying the perpetrator when the perpetrator is in the lineup . . . . The instruction seems to lead eyewitnesses to use the relative judgment process somewhat less than they would otherwise." G. Wells,

M. Small & S. Penrod et al., supra, 22 Law & Hum. Behav. 615.

Although we recognize that these studies and others like them strongly militate in favor of an affirmative warning to witnesses that the perpetrator may or may not be among the choices in the identification procedure, we remain convinced, at this time, that such procedural matters should continue to be the province of the law enforcement agencies of this state.[24] Those agencies maintain a vested interest in the reliability of eyewitness identifications because, as noted by one researcher, a mistaken identification "both incriminates an innocent person and fails to identify the guilty, increasing the likelihood that the latter will remain free and unsought." R. Malpass & P. Devine, "Eyewitness Identification: Lineup Instructions and the Absence of the Offender," 66 J. Applied Psychol. 482 (1981). We also remain convinced that the trial courts should continue to determine whether individual identification procedures are unnecessarily suggestive on the basis of the totality of the circumstances surrounding the procedure, rather than replacing that inquiry with a per se rule. The circumstances surrounding the various identification procedures present too many variables for us to conclude that a per se rule is appropriate. We reiterate, however, that an indication by the identification procedure administrator that a suspect is present

---

[24] In support of the implementation of effective identification procedures by law enforcement agencies, the National Institute of Justice has developed a guide that "represents a combination of the best current, workable police practices and psychological research." National Institute of Justice, "Eyewitness Evidence: A Guide for Law Enforcement," United States Dept. of Justice Pub. No. NCJ 178240 (1999), p. 2. The guide suggests that, prior to a lineup, the witness should be instructed "that the person who committed the crime may or may not be present in the group of individuals." Id., p. 32. The guide also recognizes, however, the uniqueness of individual investigations and that "local logistical and legal conditions may dictate the use of alternative procedures." Id., p. 4.

in the procedure is an unnecessarily suggestive element of the process that should be considered by the trial court in its analysis. See *State* v. *Austin*, 195 Conn. 496, 500, 488 A.2d 1250 (1985). We also agree that the trial court, as part of its analysis, should consider whether the identification procedure administrator instructed the witness that the perpetrator may or may not be present in the procedure and should take into account the results of the research studies concerning that instruction.

## 2

### Jury Instruction

Although we decline to implement a per se rule deeming identification procedures that lack a warning to the witness concerning the potential absence of a suspect unnecessarily suggestive per se, we conclude that some action is necessary to mitigate the risks of such procedures. Because of the importance of eyewitness identifications in the criminal justice system and the risks of failing to warn the witness that the perpetrator may or may not be present in the identification procedure, we deem it appropriate to exercise our supervisory authority to require an instruction to the jury in those cases where the identification procedure administrator fails to provide such a warning, unless no significant risk of misidentification exists.

Common sense suggests, and research confirms, that eyewitness identification is an important form of evidence. R. Malpass & P. Devine, supra, 66 J. Applied Psychol. 482 ("visual identification is one of the most persuasive kinds of evidence that can be presented"). Eyewitness identification evidence is particularly persuasive when the witness exhibits confidence in the identification. A. Bradfield & G. Wells, supra, 24 Law & Hum. Behav. 582 ("[u]sing a variety of different methods, researchers have found that certainty of an eyewit-

ness has a strong impact on participant-jurors' perceptions of the accuracy of the identification"); G. Wells, M. Small & S. Penrod et al., supra, 22 Law & Hum. Behav. 619–20 (surveys and studies show that people believe strong relation exists between eyewitness confidence and accuracy). Yet, as discussed in part II C 1 of this opinion, the correlation between witness confidence and accuracy tends to be weak, and witness confidence can be manipulated.

Moreover, the case studies consistently identify mistaken identifications as a significant source of wrongful convictions of innocent people. See A. Bradfield, G. Wells & E. Olson, supra, 87 J. Applied Psychol. 112; G. Wells, M. Small & S. Penrod et al., supra, 22 Law & Hum. Behav. 603; G. Wells & A. Bradfield, supra, 83 J. Applied Psychol. 360; R. Malpass & P. Devine, supra, 66 J. Applied Psychol. 482. The authors of a report commissioned by the National Institute of Justice identified and reviewed twenty-eight cases where convicted defendants were exonerated by DNA evidence. E. Connors, T. Lundregan & N. Miller et al., "Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial," National Institute of Justice, Dept. of Justice Pub. No. NCJ 161258 (1996). The authors concluded that "[i]n the majority of the cases, given the absence of DNA evidence at the trial, eyewitness testimony was the most compelling evidence."[25] Id., p. 24. A subcommittee of

---

[25] One of the cases reviewed by the authors was a Connecticut case, *State* v. *Hammond*, 221 Conn. 264, 604 A.2d 793 (1992). Although, in that case, the police found human hairs in the defendant's automobile that resembled those of the victim, and the defendant exhibited strange behavior, the victim's identification also played a role in the conviction. Id., 275. The victim positively identified the defendant as her assailant in three separate photographic arrays and at trial. Id., 273. The victim also described the defendant's automobile. Id., 273–74. We concluded, however, that the evidence of guilt was inconsistent with exculpatory blood and DNA evidence and remanded the case to the trial court for reconsideration of the defendant's motion to set aside the verdict. Id., 288–89.

the American Psychology/Law Society subsequently reviewed those cases as well as twelve additional cases where DNA analysis proved the innocence of individuals serving time in prison after being convicted of serious crimes. G. Wells, M. Small & S. Penrod et al., 22 Law & Hum. Behav. 605. It noted that, of the forty cases reviewed, thirty-six, or 90 percent, involved eyewitness identification evidence. Id.

The courts are not blind to the inherent risks of relying on eyewitness identification. "The dangers of misidentification are well known and have been widely recognized by this court and other courts throughout the United States." *State* v. *Tatum*, 219 Conn. 721, 733, 595 A.2d 322 (1991). "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' " *United States* v. *Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). Nevertheless, we must recognize that eyewitness identification remains a vital element in the investigation and adjudication of criminal acts. Although neither the federal nor the state constitution requires additional protections beyond the *Manson* standard; see part II B 1 and 2 of this opinion; we retain an interest in mitigating the risks of misidentification in the courts of this state. Therefore, we invoke our supervisory authority to do so.

"Appellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters

that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Citations omitted; internal quotation marks omitted.) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002). We ordinarily invoke our supervisory powers to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003) (" '[the exercise of our supervisory powers is] an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole' "), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

We have invoked our supervisory authority to provide guidance concerning jury instructions in the past. See *State* v. *O'Neil*, 261 Conn. 49, 74–75, 801 A.2d 730 (2002) (directing specific version of "Chip Smith" instruction); *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002) (directing trial courts to refrain from instructing jurors that "one who uses a deadly weapon on the vital part of another 'will be deemed to have intended' the probable result of that act and that from such a circumstance the intent to kill properly may be inferred"); *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999) (instructing trial courts to refrain from using "ingenuity of counsel" language). In light of the importance of eyewitness identification evidence and the conclusions to be drawn from the scientific research discussed in part II C 1 of this opinion, we conclude that it is appro-

priate to invoke that authority again to mitigate the potential risk of mistaken identification.

Therefore, unless there is no significant risk of misidentification,[26] we direct the trial courts of this state to incorporate an instruction in the charge to the jury, warning the jury of the risk of misidentification, in those cases where: (1) the state has offered eyewitness identification evidence; (2) that evidence resulted from an identification procedure; and (3) the administrator of that procedure failed to instruct the witness that the perpetrator may or may not be present in the procedure. We adopt the following language for use by our trial courts in such cases in the future:

*In this case, the state has presented evidence that an eyewitness identified the defendant in connection with the crime charged. That identification was the result of an identification procedure in which the individual conducting the procedure either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator may or may not be in the procedure.*

*Indicating to a witness that a suspect is present in an identification procedure or failing to warn the witness that the perpetrator may or may not be in the procedure may increase the likelihood that the witness will select one of the individuals in the procedure even when the perpetrator is not present. Thus, such action on the part of the procedure administrator may increase the probability of a misidentification.*

---

[26] Although we decline to delineate all of the potential factual variations that might result in the trial court finding no significant risk of misidentification, we note that one example would be where the defendant was known by the witness before the incident occurred. The trial court should make its determination of whether a significant risk of misidentification exists on the basis of the totality of the circumstances.

*This information is not intended to direct you to give more or less weight to the eyewitness identification evidence offered by the state. It is your duty to determine what weight to give to that evidence. You may, however, take into account this information, as just explained to you, in making that determination.*

In summary, although we remain convinced that the implementation of adequate warnings to witnesses prior to identification procedures, concerning the possibility that the perpetrator may be absent from the identification procedure, should continue to be the province of the law enforcement agencies of this state, we also conclude that juries should be made aware of the increased risk of misidentification associated with not giving such warnings. Incorporation of the suggested jury instruction, where appropriate, strikes the proper balance between the administrative autonomy of law enforcement agencies and the rights of defendants.

The judgment is affirmed.

In this opinion the other justices concurred.