******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DASHAWN
JAMES REVELS
(SC 19170)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued December 11, 2013—officially released September 30, 2014*

*James B. Streeto*, assistant public defender, for the
appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney,
with whom, on the brief, were *Michael L. Regan*, state's
attorney, and *David J. Smith*, senior assistant state's
attorney, for the appellee (state).

*Hope C. Seeley* filed a brief for the Innocence Project
as amicus curiae.

*Lisa J. Steele* filed a brief for the Connecticut Crimi-
nal Defense Lawyers Association et al. as amici curiae.

*Opinion*

ESPINOSA, J. The defendant, Dashawn James Revels, appeals[1] from his judgment of conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal, the defendant raises the following four claims: (1) the trial court improperly denied his motion to suppress the pretrial and in-court[2] identifications of the defendant because the court concluded that the one-on-one showup identification procedure was not unnecessarily suggestive, and, even assuming that it was, the identification nonetheless was reliable; (2) the trial court improperly denied the defendant's motion to have the jury view the crime scene; (3) the state did not disprove beyond a reasonable doubt that the defendant acted in self-defense; and (4) the trial court improperly instructed the jury that an "initial aggressor" includes a person who appeared to threaten the imminent use of physical force. We affirm the judgment of conviction, addressing each of the defendant's claims in turn.

The jury could have found the following relevant facts. On the night of March 31, 2009, sometime shortly before 11 p.m., the victim, Bryan Davila, was walking on Crystal Avenue, near the Thames River Apartments, a three building complex in New London (apartment complex). A group of approximately eight to nine men, including the defendant, were walking closely behind him. The victim crossed over from Crystal Avenue to State Pier Road. Most of the men in the group continued walking toward a nearby footbridge to a nearby housing project. Two men in the group, however, one of whom was the defendant, remained near the victim. The defendant then ran toward the victim, who was on the sidewalk on State Pier Road in front of a building housing an electrical supply company. When the victim attempted to run, the defendant fired numerous shots at the victim, who fell to the ground. The defendant then fled the scene on foot.

Immediately after he was shot, the victim called 911. He was unable to communicate with the dispatcher, so she triangulated his location to the closest cell phone tower. She then notified the New London Police Department of the call and the likely location of the victim. When police reported to the area, they found the victim lying face up on the sidewalk, breathing, but unable to communicate, with a nine millimeter semiautomatic pistol near his right hand and his cell phone on the ground nearby, with the call to the 911 dispatcher still connected. After securing the area, some officers remained to assist emergency medical services as they provided treatment to the victim, while others were sent to canvass the neighborhood. The victim was subsequently taken by ambulance to the hospital, where he was pronounced dead at 11:37 p.m. The autopsy later revealed that the victim bled to death from gunshot

wounds, one in the abdomen, another in the left buttock, and a grazing wound near the left shoulder blade. Two .22 caliber bullets were recovered from the victim's body. Eight spent .22 caliber shell casings were discovered at the scene. A single, nine millimeter cartridge case was removed from the chamber of the nine millimeter pistol.

While canvassing the area of the apartment complex, Officer Justin Clachrie was approached by two women, Fidelia Carrillo and her younger sister. Because Carrillo spoke only Spanish, her younger sister translated for her. Carrillo explained to Clachrie that she had seen the shooting from her apartment windows on the fifth floor of 40–46 Crystal Avenue, a building in the apartment complex. Although the building was located approximately 265 feet away from where the victim's body was found, Carrillo had been able to see that the shooter was a black male with braided hair, wearing a green camouflage jacket, a red baseball cap, dark pants and dark tennis shoes. Shortly after Clachrie broadcast the description of the suspected shooter over the radio, he received news that other officers had located a suspect matching that description. He then asked Carrillo if she and her sister would accompany him to view the suspect, which Carrillo agreed to do.

Clachrie drove Carrillo and her sister to Home Street in New London, where officers had apprehended the defendant. When Clachrie pulled up at approximately 11:40 p.m., the defendant was standing in the middle of the road, handcuffed and surrounded by uniformed police officers. Clachrie directed the spotlight on his cruiser toward the suspect, at which point Carrillo, with no prompting from Clachrie, exclaimed in Spanish, "That's him!" The defendant was wearing a camouflage jacket, a red cap, and dark pants.

The police had apprehended and detained a second suspect, Eric Caple, in the same general vicinity as the defendant. After she had identified the defendant, they brought Caple forward to show him to Carrillo. Although Carrillo identified Caple as being present at the murder scene, she hesitated in making the identification and did not evince the same level of "excitement" that she had displayed when identifying the defendant.

The defendant was taken to the New London Police Department, where his hands and clothes were tested for gunshot residue,[3] and he was interviewed twice by Detective Richard Curcuro. During the first interview, after he was advised of his rights, the defendant denied being in the area of the shooting. When Curcuro interviewed the defendant for a second time, however, the defendant admitted to being present at the crime scene after being shown still photographs of him taken from video surveillance footage from cameras at one of the buildings in the apartment complex. The defendant admitted that outside the apartment complex, his group

had a confrontation with a Hispanic man. The Hispanic male then pulled out a gun and fired shots at the defendant's group. Finally, the defendant told Curcuro that he had fired back at the victim, and then had discarded the gun by throwing it down an embankment near the footbridge as he ran away.[4]

In a substitute information, the defendant was charged with murder in violation of § 53a-54a. Following his conviction, the defendant's subsequent motions for a new trial and a judgment of acquittal were denied. This appeal followed.

## I

## IDENTIFICATION

We first address the defendant's claim that the trial court improperly denied his motion to suppress both the pretrial and in-court identifications. The defendant claims that both identifications should have been precluded because the one-on-one showup identification procedure was unnecessarily suggestive without any exigency that supported a need for an immediate identification, and because the identification was unreliable. Assuming without deciding that the identification procedure was suggestive, we conclude that it was not *unnecessarily* so because the procedure was justified by the need for an immediate identification. Accordingly, we affirm the ruling of the trial court denying the defendant's motion to suppress.[5]

The following additional facts are relevant to our resolution of this claim. During trial, the defendant moved to suppress Carrillo's identification of him, on the bases that the one-on-one showup procedure was unnecessarily suggestive, and that, viewed under the totality of the circumstances, the identification was unreliable. The trial court held a hearing on the motion to suppress, during which the court heard testimony from Clachrie and Carrillo, and from Officer Roger Newton, who was present both at the crime scene and the showup identification. Clachrie's testimony closely mirrored the testimony he offered at trial, with the exception that he mistakenly identified a legal intern seated at defense counsel's table as the defendant.

Carrillo was questioned extensively during the suppression hearing regarding what she witnessed on the night of the shooting. She testified that on that night, she was in her fifth floor apartment at 40–46 Crystal Avenue. At approximately 11 p.m., she heard a disturbance outside, so she looked out her kitchen window. She saw the victim walking on Crystal Avenue, and a group of men walking on the other side of the street. She observed the victim walk toward State Pier Road, while the group of men walked toward a footbridge that leads to a housing project. Two of the men in the group, however, then turned around and ran back to the victim, who was now on the sidewalk on State Pier

Road, standing in front of an electrical supply company. Carrillo testified that her view from the kitchen window was unobstructed and the two men were standing directly under a street light. The victim tried to run and then Carrillo heard approximately six gunshots. At the same time that she heard the gunshots, Carrillo could see flashes emanating from the hand of one of the two men who had run toward the victim. Although she could not see a gun, she inferred from the sounds and the flashes that the man had shot the victim. Carrillo could see that the shooter was black, that his hair was braided, and that he was wearing a red cap, a green camouflage jacket, dark pants and dark tennis shoes.

Carrillo testified during the suppression hearing that during the one-on-one showup procedure, she had identified the defendant on the basis of the clothing he was wearing. When the prosecutor asked her if she saw the person she had identified as the shooter in the courtroom, Carrillo said that she did, and then pointed to a legal intern seated at defense counsel's table. When questioned on cross-examination regarding her misidentification of the intern, who is black, as the defendant, Carrillo responded, "But you don't see that they're the same? And two years have gone by since all this."

The day after the trial court denied the defendant's motion to suppress, Carrillo testified, and was again asked by the prosecutor to identify the shooter in the courtroom. She correctly identified the defendant as the shooter. During cross-examination, defense counsel elicited testimony from Carrillo concerning her misidentification the prior day.

The legal principles guiding our review of a defendant's constitutional challenge to an eyewitness identification procedure are well established. "In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, *if it is found to have been so*, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . *State* v. *Theriault*, [182 Conn. 366, 371–72, 438 A.2d 432 (1980)]; see also *Manson* v. *Brathwaite*, [432 U.S. 98, 107, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)] ([T]he first inquiry [is] whether the police used an impermissibly suggestive [identification] procedure. . . . *If so*, the second inquiry is whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.); *United States* v. *DeCologero*, 530 F.3d 36, 62 (1st Cir.) (we first determine whether the identification procedure was impermissibly suggestive, *and if it was*, we then look to the totality of the circumstances to decide whether the identification was reliable), cert. denied, 555 U.S.

1005, 129 S. Ct. 513, 172 L. Ed. 2d 376 (2008)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 47–48, 3 A.3d 1 (2010), cert. denied, U.S. , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). We emphasized in *Outing* that "[w]e continue to endorse and adhere to this widely utilized analytical approach. . . . Therefore, [t]he critical question . . . is what makes a particular identification procedure suggestive enough to require the court to proceed to the second prong and to consider the overall reliability of the identification. . . . In deciding that question . . . the *entire* procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it ultimately should be suppressed." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 48–49.

"Because, [g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect . . . [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Citation omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 548, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). "We have recognized that generally a one-to-one confrontation between a [witness] and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty. . . . We also have recognized, however, that the existence of exigencies may preclude such a procedure from being *unnecessarily* suggestive. . . .

"In the past, when we have been faced with the question of whether an exigency existed, we have considered such factors as whether the defendant was in custody, the availability of the victim, the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail. . . . We have also considered whether the identification procedure provided the victim with an opportunity to identify his assailant while his memory of the incident was still fresh." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 549.

In the present case, the police needed to act quickly. At the time that they detained the defendant, they knew that a shooting homicide had been committed immediately prior to their arrival at the scene of the crime. The report of shots fired came over the dispatch at

approximately 11 p.m., and officers were at the scene within minutes, where the victim lay dying. They did not know, however, whether the gun found near the victim's body was the murder weapon. That gun's location near the victim's hand made it reasonable for the police to believe that it more likely belonged to the victim. It was reasonable for the police to believe, therefore, that the shooter was likely to be on the run, in the area, and armed. Safeguarding the public from a possibly armed and dangerous fugitive was an immediate and pressing need. Moreover, although the defendant matched the description of the shooter, and was in custody at the time of the identification procedure, the police had not recovered a gun from him. It was possible, therefore, that they had not apprehended the shooter. Thus, it was necessary to conduct a showup procedure in order to eliminate him as a suspect as soon as possible so that the police could continue to search for the shooter and recover the murder weapon. Finally, although there were no problems with Carrillo's future availability, the immediate identification ensured that she viewed the suspect while her recollection was still fresh. This is particularly significant in light of the trial court's finding that because it was approximately 11:40 p.m. when Carrillo was brought to the area where police had detained the defendant, it would not have been practicable to conduct a lineup or a photographic array.[6] Weighing all of these factors, we conclude that the trial court properly determined that, although the court had found that the one-on-one showup procedure was suggestive, it was not unnecessarily so.[7]

We find unpersuasive the defendant's argument that our case law supports the conclusion that because there was no evidence that the victim's murder was part of an ongoing crime spree at the time that the police detained the defendant, there was no exigency justifying the showup. The defendant contends that the police should have treated the incident as a "completed" crime, and thus that there was no exigency in the present case. Relying on this court's decision in *State* v. *Ledbetter*, supra, 275 Conn. 534, the defendant's argument suggests that the police should have assumed that no further criminal activity would occur in the immediate future, and, therefore, that quick action was not necessary to protect the public. Nothing in our case law supports this conclusion, which would require the police to make assumptions inconsistent with their duty to protect the public. It is true that in concluding that the showup identification procedure at issue in *Ledbetter* was necessary, we considered it significant that at the time that the victim in that case identified the defendant, there had been three reports of similar robberies in the general vicinity. Id., 550. The fact that there was a possibility that the perpetrators could still be active in the area was relevant to our conclusion that the showup procedure was necessary. Id. Simply

because we relied on that fact in *Ledbetter*, however, does not mean that its absence in the present case means that the showup procedure was not necessary. The significance of the string of robberies in *Ledbetter* was that it supported the reasonable belief of the police that immediate action was necessary to safeguard the public from danger. In the present case, the facts supporting the immediate need for a showup identification, although different, are no less compelling. The police had reason to believe that an armed and dangerous person, who had just shot and killed a man less than one hour before they had detained the defendant, was at large in the community.

## II

### JURY VIEWING

We next address the defendant's claim that the trial court abused its discretion in denying his motion to have the jury view the scene of the crime. The defendant maintains that the viewing would have been helpful to the jury, as it would have illustrated to the jury the significant distance from which Carrillo witnessed the shooting. The defendant contends that in light of the importance of Carrillo's testimony to the strength of the state's case, it was vital that the jury view the scene in order to be able properly to evaluate the adequacy of her opportunity to view the shooting. The trial court denied the defendant's motion on the basis that the scene of the crime would appear significantly different in late July, at the time of trial, than it had appeared on March 31, at the time of the shooting. The state argues that the trial court properly denied the defendant's motion, because conditions at the scene of the crime had changed so much that a viewing would not be helpful.

It is within the discretion of the trial court to allow the jury to view a "place or thing involved in the case" if the court "is of the opinion that a viewing . . . will be helpful to the jury in determining any material factual issue . . . ." Practice Book § 42-6. In exercising its discretion, the test applied by the trial court is "whether a view is necessary or important in order to obtain a clearer understanding of the issues and to apply the evidence properly." *Dickson* v. *Yale University*, 141 Conn. 250, 256, 105 A.2d 463 (1954). "[T]he power to authorize a view of the scene should be invoked only after the court is satisfied that the present conditions at the site are the same as those that existed on the date of the underlying incident." (Internal quotation marks omitted.) *State* v. *Boutilier*, 133 Conn. App. 493, 503–504, 36 A.3d 282, cert. denied, 304 Conn. 914, 40 A.3d 785 (2012); see also C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 11.9.2, p. 731 ("[b]efore a court can grant a view, it must be satisfied that the conditions at the time of the view are substantially similar to those that existed at the time of the event").

We conclude that the trial court acted within its discretion in denying the defendant's motion to have the jury view the crime scene. There had been testimony that, although there was a tree between Carrillo's apartment windows and the shooting scene, there were no leaves on the tree on the night of the crime, March 31. Because the defendant's trial took place in July, however, the court properly relied on the fact that the tree would have leaves, a significant change from the conditions that existed on the night of the murder.

### III

### SUFFICIENCY OF THE STATE'S EVIDENCE

### TO DISPROVE SELF-DEFENSE

The defendant next claims that the state failed to meet its burden to disprove his claim of self-defense. The defendant concedes that this claim is unpreserved and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We have observed that "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding.*" *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993). Accordingly, because there is "no practical significance . . . for engaging in a *Golding* analysis," we review an unpreserved sufficiency of the evidence claim as though it had been preserved. Id. Our review of the record, however, persuades us that the state produced sufficient evidence to disprove the defendant's claim of self-defense beyond a reasonable doubt.

"On appeal, the standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence." *State* v. *Brocuglio*, 56 Conn. App. 514, 517, 744 A.2d 448, cert. denied, 252 Conn. 950, 748 A.2d 874 (2000). "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). Moreover, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 594, 72 A.3d 379 (2013).

The rules governing the respective burdens borne by the defendant and the state on the justification of self-defense are grounded in the fact that "[u]nder our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. See General Statutes § 53a-16. Whereas an *affirmative defense* requires the defendant to establish his claim by a preponderance of the evidence, a properly raised *defense* places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. See General Statutes § 53a-12. Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt. General Statutes § 53a-12 (a) . . . ." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State* v. *Clark*, 264 Conn. 723, 730–31, 826 A.2d 128 (2003).

The substantive principles governing a defendant's claim of self-defense are well settled. Under § 53a-19 (a), "a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) Id., 731.

In order to determine whether the state produced sufficient evidence to disprove beyond a reasonable doubt the defendant's claim of self-defense, we must first set forth the defendant's theory of self-defense. Specifically, at trial, the defendant consistently pursued as his theory of self-defense that, if the jury believed that the defendant was the shooter, he had acted in self-defense *because the victim shot first*. The defendant relied on the following evidence. The police discovered a gun at the scene of the shooting, near the victim's hand. The gun was a nine millimeter semiautomatic pistol, and it was not the gun used to kill the victim. The state's gunshot residue expert testified that he found lead and antimony particles on samples taken from the victim's left and right palms and lead particles on a sample taken from the back of the victim's right

hand. The victim's girlfriend, Alexandra Moya, testified that prior to the shooting, the victim was with her in her apartment on Federal Street. He left the apartment, immediately returned, grabbed a gun, and then left again. A short time later, she heard gunshots. Carrillo testified that she was first drawn to look out her window by the sounds of yelling outside. When she looked outside to determine the source of the yelling, that was when she first saw the victim and the group of men walking behind him. She also testified that when the shooter shot the victim, she saw "flash[es]" coming from the shooter's hand, from which she inferred that he fired a gun. She was clear that she could not see a gun in the shooter's hand from that distance. Finally, the defendant testified that members of his group shot at the victim only after the victim shot at them first. During closing argument, the defendant claimed that the evidence established that the victim had fired a shot at the scene of the crime. If the jury disbelieved the defendant's primary defense of misidentification, the defendant submitted, he was entitled to defend himself "if [the victim] started shooting first . . . ."

The state produced the following evidence to disprove the defendant's claim that he was entitled to defend himself because the victim started shooting first. James Stephenson, a forensic science examiner specializing in firearm and tool marks, testified that he examined the nine millimeter semiautomatic pistol found at the scene. He also examined a discharged nine millimeter cartridge case that was removed from the chamber of the pistol. He testified that a properly functioning semiautomatic firearm ejects the shell casings upon firing. He had tested the pistol and found it to be in working condition. The only nine millimeter casing recovered from the scene was the one that was in the chamber of the pistol found near the victim's body. The remaining shell casings recovered from the scene were from a .22 caliber firearm or firearms. Stephenson further testified that the nine millimeter pistol could not have been fired without first removing the spent cartridge from the weapon. Additionally, the state pointed to Moya's testimony that when the victim left the apartment with a gun, there was to her knowledge only one cartridge in the gun. The state also relied on Carrillo's testimony that she saw flashes coming only from the hand of the person wearing the camouflage jacket, and that she did not see any flashes coming from the victim's hand. Finally, the state relied on the fact that two of the three bullets hit the victim when he was facing away from the shooter, hitting him in the left buttock and the left shoulder blade.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the state produced ample evidence to disprove the defendant's defense of self-defense beyond a reasonable doubt. The defendant's theory was that he reasonably believed that

it was necessary to use deadly force because the victim fired a gun at him. The state produced overwhelming evidence that the pistol found near the victim could not have been fired at the scene.[8] The evidence clearly establishes that if the semiautomatic nine millimeter pistol had been fired, there would be shell casings on the ground to confirm that. There were none. The presence of the spent cartridge in the chamber of the pistol made it even less likely that the pistol could have been fired, because expert testimony established that the cartridge would have had to be removed before the weapon was fired. The testimony of Moya, which the jury was entitled to credit, established that there was only one cartridge in the victim's pistol. Carrillo's testimony that she saw flashes coming only from the defendant's hand, and not from the victim's hand, provides further support for the conclusion that the defendant did not shoot in response to the victim opening fire. If the jury chose to credit the state's testimony, which it obviously did, that evidence was more than sufficient to support the finding that the state disproved the defendant's justification defense.

## IV

## JURY INSTRUCTION ON INITIAL AGGRESSOR

Finally, we address the defendant's claim that the trial court committed plain error in its charge to the jury on the defendant's claim of self-defense when it defined an "initial aggressor" as "the first person who threatened to use physical force or even the first person who appeared to threaten the imminent use of physical force under the circumstances." The defendant claims that the definition improperly broadened the meaning of "initial aggressor": (1) by suggesting that a person could be found to be the initial aggressor solely on the basis of his use of words; and (2) by failing to insert the word "reasonably" before the word "appeared." That failure, the defendant contends, suggests that the appearance of a threat is defined solely from the perspective of the complaining witness, removing the reasonable person standard from the instruction. The defendant also claims that the omission of the word "reasonable" suggests that a defendant could be found to be the initial aggressor on the basis of mere words. We conclude that the instruction did not constitute plain error.

We first set forth the principles governing our standard of review for a claim that a jury charge constitutes plain error. "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situa-

tions where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . .

"[W]e recently clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . We made clear . . . that this inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." (Internal quotation marks omitted.) *State* v. *Darryl W.*, 303 Conn. 353, 371–73, 33 A.3d 239 (2012).

"[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360–61, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

After the trial court instructed the jury regarding the standards applicable to the defendant's claim of self-defense, the court set forth the statutory disqualifications to self-defense, including the initial aggressor exception. The trial court instructed the jury that "a person is not justified in using any degree of physical force in self-defense against another . . . when he is the initial aggressor in the encounter with the other person and does not both withdraw from the encounter and effectively communicate his intent to do so before using the physical force at issue in the case." In order to prove that the defendant was the initial aggressor, the court explained, "the state need not prove that the defendant was the first person to use physical force in that encounter. The initial aggressor can be the first

person who threatened to use physical force or even the first person who appeared to threaten the imminent use of physical force . . . under the circumstances."

Although the challenged portion of the instruction does not clarify that in order for a defendant's actions to qualify as having the appearance of threatening the imminent use of physical force, those actions must be judged by the objective, reasonable person standard, we look to the court's entire charge on self-defense to determine whether it is reasonably possible that the jury was misled. *State* v. *Jimenez*, 228 Conn. 335, 341, 636 A.2d 782 (1994). At other points in the court's instructions relating to self-defense, the court properly and thoroughly explained that in order for a defendant to claim that he has acted in self-defense, the defendant's belief that the other actor is about to use physical force must be a reasonable one. The court's definition of "initial aggressor" must be understood therefore to incorporate the notion that only actions that *reasonably* appear to threaten the imminent use of physical force will make the defendant an initial aggressor. We therefore conclude that there was no reasonable possibility that the jury was misled. The instruction did not constitute plain error.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed from the judgment of conviction to this court, and we transferred the appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Thereafter, upon the motion of the defendant, we transferred the appeal to this court pursuant to § 51-199 (c) and Practice Book § 65-2.

[2] The defendant's challenge to the in-court identification was based on his claim that the original identification was both unnecessarily suggestive and unreliable.

[3] The results of the gunshot residue tests were inconclusive. They revealed the presence of lead and antimony particles on the victim's palms and the presence of lead on the defendant's left palm and the back of his right hand. A single lead particle was discovered on the right cuff of the defendant's sweatshirt, and no lead particles were discovered on his jacket. On the basis of these results, the state's forensic expert testified that he could not conclude whether either the defendant or the victim had fired a gun on the night of the shooting.

[4] The interviews that Curcuro conducted of the defendant were recorded, and the transcript of the recording indicates that rather than stating, as Curcuro testified, "I shot back," the defendant stated that after the victim fired on the defendant's group, "*we* start shooting back." (Emphasis added.) The state claimed at trial that the recording from which the transcript was taken was garbled, and that the transcriber incorrectly heard the defendant to say "we" shot back, instead of "I" shot back. The audio recording of the interviews was played to the jury during trial.

[5] Our conclusion that the one-on-one showup procedure was justified by exigency renders it unnecessary for us to address the defendant's claim that the identification was unreliable. We accordingly need not address the defendant's claim that this court should abandon the use of the eyewitness' level of certainty as one of the factors for evaluating the reliability of an eyewitness' identification. See *State* v. *Ledbetter*, 275 Conn. 534, 546 n.8, 881 A.2d 290 (2005) (summarizing factors for evaluating reliability under *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 [1972]); cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

[6] The defendant argues that advances in digital and computer technology, which have made the process of assembling photographs much quicker, render the trial court's finding that it was impracticable to assemble an

array at that late hour reversible error. The defendant appears to suggest that the trial court's factual finding is clearly erroneous. We disagree. Regardless of advances in technology, the trial court was entitled to take into account the time of day when assessing the practicability of assembling a photographic array.

[7] The defendant did not object to the in-court identification on the basis of the misidentification one day earlier at the suppression hearing. During cross-examination at trial, however, the defendant did question Carrillo about the misidentification. The exchange between defense counsel and Carrillo demonstrates that the jury was made aware of the earlier misidentification:

"[Defense Counsel]: Do you recall testifying here yesterday at our hearing? Do you remember being here yesterday?

"[Carrillo]: Correct.

"[Defense Counsel]: And when you identified somebody other than my client, do you remember that?

"[Carrillo]: Correct."

The defendant, therefore, had the opportunity to impeach Carrillo's credibility before the jury on the basis of the misidentification, and he availed himself of that opportunity. It was thereafter within the province of the jury to weigh that impeachment evidence accordingly in determining whether to credit Carrillo's in-court identification of the defendant as the shooter.

[8] The defendant contends that the state failed to meet its burden of persuasion because it failed to disprove that the victim was facing the defendant with a drawn firearm when the defendant fired upon him. It was not sufficient, the defendant claims, for the state to disprove the defendant's claim that the victim fired first. According to the defendant, the state also had to disprove beyond a reasonable doubt a claim that the defendant never made at trial, that the victim merely drew his gun and pointed it at the defendant, supporting the defendant's reasonable belief that the victim was about to use deadly force against him. We disagree. The defendant's theory of self-defense was specific. He claimed that if the jury concluded that he was the shooter, he reasonably believed that he needed to use deadly force to defend himself because the victim fired first. He did not testify that he responded to the victim's action of aiming a gun at him. His account of the event, therefore, is not even factually consistent with the self-defense theory that he claims the state bore the burden to disprove beyond a reasonable doubt. The defendant cites to no authority, and we have found none, to support the proposition that the state was required to disprove not only the theory of self-defense presented by the defendant at trial, but also any possible theory he *could* have presented, even if his own testimony is not consistent with the theory of self-defense that he claims the state should be required to disprove.